## AFFIDAVIT

I, Colin M. Simons, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Burlington, Vermont Resident Agency of the Albany, New York Division. I have been a Special Agent for over 15 years. I am responsible for working cases involving a variety of criminal violations, to include violent crimes and gangs. I have also been the affiant to numerous federal complaints and search warrants pertaining to violent crime and controlled substances. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2.     I submit this affidavit in support of applications for:

　　　　a. A search warrant for the residence, outbuildings, and vehicles located at 191 Hutchins Farm Road, Stannard, Vermont (the "SUBJECT PREMISES"), described in further detail in Attachment A, attached and incorporated herein.  The items to be seized during the search of the SUBJECT PREMISES are listed in Attachment B, also attached and incorporated herein.

　　　　b. Arrest warrants for Eric Colson III ("ERIC COLSON")[1] and GAGE COLSON.

3.     The information contained within this affidavit based upon my training, experience, and investigation, as well as information that has been conveyed to me by other law

---

[1] Eric Colson III's father, Eric Colson Jr., also resides at the SUBJECT PREMISES.

enforcement officers.  The following has been related to me by persons having direct knowledge of the events described below, including Vermont Drug Task Force ("VDTF") Det. Sgt. Karl Gardner, VDTF Det. Steven Fauteux and VDTF Det. Chris Quesnel, and other law enforcement officers involved in this investigation. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

4.      For the reasons set forth in this affidavit, probable cause exists to search the SUBJECT PREMISES for evidence of violations of 21 U.S.C. § 841 (possession with intent to distribute heroin/fentanyl), and 21 U.S.C. § 846 (conspiracy to distribute heroin/fentanyl), including contraband and fruits of these crimes, property designed for use, intended for use, or that has been used in committing these crimes, and persons to be arrested. Additionally, there is probable cause to believe that both ERIC and GAGE COLSON have violated 21 U.S.C. § 846.

## **PROBABLE CAUSE**

### *Controlled Purchase of Fentanyl from GAGE COLSON*

5.      The VDTF and FBI have been investigating ERIC and GAGE COLSON for distribution of heroin/fentanyl and cocaine base from their residence, the SUBJECT PREMISES. The investigation has taken place with the assistance of a confidential informant (the "CI")[2]. During the week of August 30, 2021, Det. Quesnel arranged a meeting with the CI in order to prepare to conduct a controlled purchase of heroin and/or fentanyl (Schedule I and Schedule II

---

[2] The CI has used heroin in the past and is not an active user of narcotics but does take methadone. The CI has open, pending charges for a felony crime of violence as well as other related misdemeanor offenses. The CI has no felony convictions but does have misdemeanor convictions including unlawful trespass and theft.  There has been no promise of consideration on the CI's pending charges.

controlled substances, respectively) from the SUBJECT PREMISES. On this occasion, the CI told the VDTF that s/he had previously purchased narcotics numerous times from both ERIC and GAGE COLSON at their residence located at 191 Hutchins Farms Road, Stannard, VT, the SUBJECT PREMISES. The CI also explained that it would not be normal to contact either of the COLSONs prior to setting up a deal. Instead, customers simply go to the SUBJECT PREMISES to purchase narcotics between 10 AM and 10 PM, which the CI indicated were the COLSONs' normal "business hours."

6.       The CI and its vehicle were searched prior to the controlled purchase. No contraband was located on the CI's person, while two kitchen knives and a dollar bill were removed from the CI's vehicle and held by VDTF during the controlled purchase. The CI was provided with pre-recorded Task Force Funds to purchase heroin/fentanyl from either ERIC or GAGE COLSON. The CI was also provided with audio/video/recording/transmitting equipment. The CI left the meeting location and traveled directly to the SUBJECT PREMISES under constant law enforcement surveillance. The CI arrived and entered at the SUBJECT PREMISES. Law enforcement continued to drive by the SUBJECT PREMISES to confirm the presence of the CI's vehicle during the controlled buy. After approximately six minutes at the SUBJECT PREMISES, the CI was observed leaving the SUBJECT PREMISES in its vehicle. The CI drove directly to a prearranged meeting location under constant surveillance of law enforcement.

7.       The CI subsequently turned over to Det. Quesnel the expected amount of suspected heroin/fentanyl corresponding with the amount of buy money provided to CI from VDTF. The CI advised Det. Quesnel that s/he had purchased heroin from Gage Colson. The CI's person and vehicle were searched and no contraband was located. VTDF Det. Quesnel tested a small portion of the suspected heroin/fentanyl from the controlled buy with a Sirchie NARK II

3

(Narcotics Analysis Reagent Kit) field test kit. The test yielded a positive result for the presence of fentanyl.

8.      The CI then provided a sworn statement to VDTF, which is summarized as follows: The CI knew ERIC and GAGE COLSON to reside at the SUBJECT PREMISES, having been to this location on prior occasions. After meeting with law enforcement, the CI traveled to the SUBJECT PREMISES and went inside and upstairs where s/he purchased heroin from GAGE COLSON.  There were two unknown male individuals present at the time.  The CI exited the residence, returned to its vehicle, departed, and then returned to the meet location to meet with law enforcement.  The CI turned over the purchased narcotics and did not tamper with any money or evidence (drugs) before, during or after the controlled buy. The CI and its vehicle were searched before and after the controlled buy. No contraband was found or missed during these searches. The only money the CI received was from the VDTF to purchase narcotics, and the only narcotics the CI received was from GAGE COLSON.

9.      Det. Quesnel reviewed the electronic recording equipment used by the CI during the buy.  On the recordings, which include video footage from a hidden camera, Det. Quesnel observed the CI drive its vehicle to the residence portion of the SUBJECT PREMISES, exit the vehicle, and enter the residence. The CI walked up a staircase and knocked on the door before entering a room. Det. Quesnel identified this room as the apartment above the garage, which is the only second-story area of the residence. Multiple voices can be heard in the room. Det. Quesnel, who is familiar with GAGE COLSON's appearance from his Facebook profile photograph as well as a Department of Motor Vehicle photograph, identified GAGE COLSON as the person seen in the video whom the CI asks for narcotics.

4

10.     The CI participated in two separate debriefings with Det. Quesnel and Det. Sgt. Karl Gardner. The first debriefing took place before the controlled buy, while the second took place after the controlled buy. During the debriefings the CI stated that both ERIC and GAGE COLSON are users of controlled substances, in addition to being distributors of controlled substances. The CI additionally stated that the narcotics are typically concealed within the residence located on the SUBJECT PREMISES, specifically, beneath the couch situated behind the "register," as well as overhead in the rafters/ceiling. The CI advises s/he has witnessed firearms at the residence, including two AR-15-style rifles which hang upon the wall. Footage from the hidden video camera used by the CI during the controlled buy within the SUBJECT PREMISES revealed an AR-15, equipped with a red dot or similar sign system, hanging on a wall. The CI stated that s/he believes the AR-15 is owned by ERIC COLSON and that ERIC COLSON has owned the AR-15 for some time.[3] The CI stated that at the time of the controlled buy there was a substantial amount of narcotics at the COLSON's residence, including heroin and cocaine base. The CI knew this given the volume of customers and the fact that every time s/he had gone to the SUBJECT PREMISES the COLSONs always had enough drugs to supply these customers, including the CI. The CI also stated that money and drugs are buried in the ground on the property. The CI indicated that s/he knows this information because the COLSONs told the CI they had been robbed by an individual (with the same first name as SOI-2 below) who dug up drugs hidden in the ground. CI also stated there was construction taking place upon the property,

---

[3] I have reviewed ERIC COLSON's criminal history, which indicates that on August 22, 2017, ERIC COLSON was convicted of burglary into an occupied dwelling in Caledonia (VT) District Court. As a result of this felony conviction, I believe that ERIC COLSON is likely prohibited from possessing firearms.

including what appeared to be a new road being built nearby. According to the CI, the COLSONs don't allow anyone near that part of the property. The CI could see excavators present on the SUBJECT PREMISES but it was unclear to the CI what their function was.

11.     During the week of August 30, 2021, I observed a road or driveway to the west of the SUBJECT PREMISES which intersects with Hutchins Farm Road.[4] This road was not present during prior surveillance of the property, including in June of 2021.  Attachment A includes an image taken within the past two weeks showing the new road, which is approximately 250 yards in length, appearing to lead to what appears to be a trailer.  On earlier occasions during 2020, a similar looking trailer was observed by law enforcement near the residence at 191 Hutchins Farm Road. As of the date of the above-described controlled purchase of fentanyl, the trailer was no longer located near the residence. Because of its close proximity to the boundary line, it is unknown whether road/driveway begins on the parcel containing 191 Hutchins Farm Road or the neighboring parcel, 170-174 Hutchins Farm Road.  I know from a review of public databases that this neighboring parcel is owned by Corrinna Colson and that she is ERIC and GAGE COLSON's aunt. Because the COLSONs exercise dominion and control over the road/driveway by not allowing customers near that part of the property, for purposes of this application the road/driveway and the trailer/RV to which it leads are included as part of the SUBJECT PREMISES.

_____

[4] The undersigned affiant is unable to discern whether the end of this newly constructed driveway is within the parcel that includes the residence located at 191 Hutchins Farm Road. This application nonetheless seeks authority to search vehicles and structures, if any, that are located at or near the end of this driveway regardless of what parcel they are on.  For purposes of this application, such vehicles and structures are considered part of the SUBJECT PREMISES.

6

*Additional Information*

12.     In August of 2020, I separately interviewed two sources of information (the "SOIs") [5] who each stated that they had worked together to steal approximately $75,000.00 worth of heroin and cocaine base from ERIC COLSON at the SUBJECT PREMISES. The SOIs each indicated that prior to the robbery, which I understood to have occurred earlier in August of 2020, they were frequent customers of ERIC COLSON and would purchase large quantities of prepackaged heroin and cocaine base from him several times a week. SOI-1 stated that ERIC COLSON sells $10,000-$20,000 of controlled substances per day, while SOI-2 stated that ERIC COLSON sells as much as $125,000 of controlled substances every few days. SOI-1 indicated that s/he knew this because s/he had counted money for ERIC COLSON. SOI-1 additionally stated that ERIC COLSON adds food coloring to the cocaine base he manufactures as a means of identifying the product as his. SOI-2 indicated that s/he had traveled with ERIC COLSON to purchase drugs from ERIC COLSON's source of supply, but was asked to exit ERIC COLSON's vehicle before he met with his source of supply.  SOI-2 indicated that both ERIC and GAGE COLSON use controlled substances, including cocaine base and heroin.

13.     Both SOI-1 and SOI-2 stated that ERIC COLSON hid controlled substances in the woods inside a water cooler. SOI-1 indicated that s/he knew this because s/he had watched where ERIC COLSON hid his drugs one night. SOI-2 further stated that at night ERIC COLSON would

---

[5] The SOIs provided information in hopes of receiving consideration for pending state drug charges.  These charges stemmed from their arrest in August of 2020 after the SOIs were found in possession of a portion of the drugs they indicated they stole from ERIC COLSON. SOI-1 has a felony burglary conviction and a number of misdemeanor convictions.  SOI-2 has felony convictions for burglary, larceny, and a drug offense, as well as a number of misdemeanor convictions including false info to law enforcement.

7

put his drug supply into a 5-gallon water cooler with a screw-on top, which was painted in a "camouflage-type paint." SOI-2 said that the water cooler was then hidden in the woods, and then retrieved again in the morning. SOI-2 indicated that ERIC COLSON took these measures because ERIC COLSON believed that if he was going to "get busted" it would be in the early morning hours when the water cooler was still hidden in the woods. SOI-2 additionally stated that GAGE COLSON had his own customer base consisting of the people ERIC COLSON "didn't want to deal with." SOI-2 indicated that the controlled substances GAGE COLSON sold to these customers came from ERIC COLSON because ERIC COLSON was the one who purchased the drugs sold at the SUBJECT PREMISES from his supplier. SOI-2 indicated that s/he knew this information, as well as the information detailed further below, as a result of its own personal observations and conversations with ERIC COLSON while at the SUBJECT PREMISES.

14.     SOI-1 indicated that ERIC and GAGE COLSON's parents also live at the residence portion of the SUBJECT PREMISES, and that ERIC COLSON and his girlfriend live in an apartment above the garage. SOI-2 stated that all drug transactions happened in the apartment above the garage. Based on my observations of the SUBJECT PREMISES and descriptions provided by other individuals described herein, I believe that this is the same location in the residence at the SUBJECT PREMISES where the aforementioned controlled buy took place.

8

15.     In December of 2020, I interviewed a cooperating defendant ("CD")[6].  The CD stated that s/he had purchased narcotics from ERIC COLSON, and that COLSON sells "a lot of drugs" and has a lot of money.  The CD did not specify whether these purchases took place at the SUBJECT PREMISES. The CD indicated that ERIC COLSON colors his cocaine base as his "signature."  The CD finally stated that ERIC COLSON is "very careful with his drugs and who he deals with."

## TRAINING AND EXPERIENCE

16.     Based on my training and experience and participation in ongoing drug trafficking investigations, I know the following:

   a.  Both small- and large-scale drug traffickers often maintain, on hand and in their residences, large amounts of U.S. Currency in order to finance their ongoing drug business;

   b.  Controlled substance traffickers commonly maintain books, records, receipts, notes, ledgers, electronic/digital data, common carrier tickets, money orders, and other documents relating to the transportation, acquisition and distribution of controlled substances;

   c.  Controlled substance traffickers commonly provide controlled substances on consignment to their clients;

   d.  The aforementioned books, records, receipts, notes, ledgers, etc. are commonly maintained where controlled substance traffickers can have ready access to them;

---

[6] The CD was providing information in hopes of receiving consideration in relation to a then-pending federal controlled substance offense – a felony – of which the CD has now been convicted.  The CD has also been convicted of two misdemeanors, including false pretenses.

9

e.  It is common for both small- and large-scale drug traffickers to secret contraband, proceeds of drug sales, and records of transactions in secure locations within their residence and/or other residences, either vacant or occupied by other members of the trafficking conspiracy (stash houses), and/or their businesses, to conceal them from law enforcement authorities;

f.  Persons involved in both small- and large-scale drug trafficking commonly conceal in their residences, stash houses and businesses caches of drugs, large amounts of currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the attainment and concealment of large sums of money acquired from engaging in narcotic trafficking activities.

17.   I know based on my training and experience that it is not uncommon for drug dealers to use one location as a place of distribution (here, the residence portion of the SUBJECT PREMISES), and another location to secure drug inventory and proceeds. Based on my training, experience, and familiarity with this investigation (including the apparent movement of the trailer, the recency of the new driveway, and the information from CI regarding the COLSONs not allowing persons down the new driveway), I believe it is likely the COLSONs have placed the trailer at the end of the new driveway in order to conceal and secure their proceeds, drug inventory, and other items they wish to hide and protect.

18.   Based on my training and experience and participation in ongoing drug trafficking investigations, I also know the following information related to cellular telephones and controlled substance violations:

10

a. Persons who participate in the distribution of controlled substances frequently use cellular telephones, among other communication devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs. I know it is common for such persons to use multiple different cell telephones.

b. I know that information stored in the memories of these communications devices constitutes evidence of drug trafficking and/or the unlawful movement of currency. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received.

c. With their cellular telephones, illegal drug distributors often take photographs of other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, and other useful evidence.

d. Data contained in a cellular phone may reveal the physical location of the cell phone at various times. For example, if a cellular phone has Global Positioning System ("GPS") capabilities, additional information regarding locations of the phone, may be recovered from the device. I also know that it is common to use cellular telephones to establish the whereabouts and directions where to obtain controlled substances when traveling interstate, such as utilizing the GPS functionality of a cellular phone.

11

e.  Cellular telephones, also known as "smartphones," are electronic devices ("devices") that contain a logic processing unit, an input/output capability, memory, and a radio antenna that permits the device to place and receive telephone calls and send and receive text or other data messages via the cellular network. These devices contain memory in several forms and locations. The most common form of memory is solid-state (as opposed to a hard drive, which is a spinning disc). Solid-state memory typically consists of a dense array of diodes that can hold tens of gigabytes of information. Most solid-state memory on a smartphone device is considered "non-volatile," meaning that data can remain in storage even when the device is powered-down by the user. By contrast, "volatile" memory is a short-term form of memory that exists only when the device is turned on.  These devices often contain memory in other locations, including removable SD cards, SIM cards, video cards, logic boards, and other microchips that maintain data in memory to perform their specific function within the phone. The scope of this warrant application is a search of all volatile and non-volatile memory contained within the devices. A search of devices may reveal evidence of communication between the device's user and others relevant to this investigation.

f.  Modern smartphone devices are capable of tracking and recording the device location data. For example, Apple iPhone devices utilize a feature called *Location Services* to track the device's location. *Location Services* uses GPS, Bluetooth, and crowd-sourced Wi-Fi hotspots and cell tower locations to determine the device's approximate location. *Location Services* allows Apple and third-party

applications and websites to gather and use information based on the current location of the iPhone to provide a variety of location-based services. For example, an application might use the device location data and location search query to help the user find nearby coffee shops or theaters, or the device may set its time zone automatically based on the current location. If a user has enabled *Location Services*, services such as, "Traffic," which periodically sends the iPhone's GPS location and travel speed to Apple, "Popular Near Me," which periodically sends locations of where, and when the device has purchased or used apps to Apple, "Significant Locations," which enables the iPhone to keep track of places the device has recently been, as well as how often and when the device visited them, in order to learn places that are significant to the device's user, and other location-based features will be logged and saved by the iPhone. Allowing a search of the may reveal the date, time and location of the devices at any particular time relevant to this investigation.

g.  In addition, many applications utilized by smartphones track location data. For example, when a photograph is taken with a smartphone device, the location of the device along with the date and time the photograph was taken is often stored in the metadata of the digital photograph file. Allowing a search of the devices may reveal the date, time, and location the device was used when a particular application was utilized.

h.  Modern smartphone devices have widely varying memory capacities, ranging from less than one gigabyte of total memory to tens of gigabytes. To put this in perspective, 1 gigabyte of data is approximately 220,000 printed pages of text.

13

The average smartphone is equipped with an average of 8 gigabytes of internal storage capacity and regularly up to a capacity of 256 gigabytes of internal storage capacity. Many smartphone models are also designed to accommodate a second data storage location. A user may elect to install any number of memory cards that can increase the capacity of the smartphone device beyond 256 gigabytes of storage capacity. Often times these secondary data storage memory cards are supplied by the manufacturer at the time the device is purchased. To place this into perspective, this storage capacity is equivalent or exceeds the internal storage capacity of many laptop computers.

i.   When smartphone users access, create, or modify files or data, the device memorializes that event in memory in some form. This memorialization of user activity ranges from the highly intuitive (an email drafted by the user is saved in the "drafts" folder of an email application) to that which only an expert might appreciate (the mere act of using the device can cause its operating system to reallocate files to new locations within memory). Files or data which have been created, accessed, downloaded, or saved by a user may be located by a trained examiner in predictable locations within a device. In some instances, files flagged for deletion by a user or otherwise "discarded" may still be retrieved by a trained forensic examiner. Given the sheer volume of available memory, it is quite likely that a file may still exist months or years after its user last accessed it.

j.   Files that have been accessed or downloaded via the Internet onto a device are typically automatically downloaded into a temporary Internet directory or "cache." The web browser often maintains a fixed amount of non-volatile

14

memory devoted to these files, and the files are overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Internet browser cache and temporary files may contain data ranging from images to the content of websites visited. Thus, the data/files gleaned from browser cache and temporary files may be as diverse as the user(s) internet usage and will tend to reflect the user(s)' internet usage.

k. Although there are several popular operating systems in use on today's smartphone devices (for example: Apple iOS, Android, and Windows), and each operating system has several versions, it is often the case that such devices maintain files that memorialize their user's patterns of life, to include the contents of locally-stored and web-accessed emails, the contents of web-based social networking communication, SMS/MMS "text" messages, call logs, contact lists, information retained by applications utilized by the user, and local (non-web-based) content created, modified, or saved by the user. A trained forensic computer examiner may employ a variety of methods to locate such files and data. A search of devices may reveal the content of communication between the users of the devices and others relevant to this investigation.

19. Based on my training and experience, I know that digital devices have capabilities that allow them to serve as a smartphone, digital camera, and Global Positioning System (GPS), and that these devices can access the internet, among other capabilities. Accordingly, examining data stored on such devices is likely to uncover, among other things, evidence of drug distribution as well as user attribution.

15

## CONCLUSION

20.     Based on the above, I believe probable cause exists to search the SUBJECT

PREMISES for evidence of violations of 21 U.S.C. § 841 (possession with intent to distribute

heroin/fentanyl), and 21 U.S.C. § 846 (conspiracy to distribute heroin/fentanyl), including

contraband and fruits of these crimes, property designed for use, intended for use, or that has

been used in committing these crimes, and persons to be arrested. Additionally, there is probable

cause to believe that both ERIC and GAGE COLSON have violated 21 U.S.C. § 846.

Respectfully Submitted,

Colin M. Simons
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September 8th, 2021.

Kevin J. Doyle
United States Magistrate Judge

16